# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

**BRYAN W. FOX,**                             )
                                              )
        **Plaintiff,**               )
                                              )
**v.**                                        )        **CIVIL ACTION NO. 5:12-05784**
                                              )
**CAROLYN W. COLVIN,**                        )
**Acting Commissioner of Social Security,**   )
                                              )
        **Defendant.**               )

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Standing Order entered September 24, 2012 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings (Document Nos. 7 and 10.) and Plaintiff's Response. (Document No. 11.)

The Plaintiff, Bryan W. Fox (hereinafter referred to as "Claimant"), filed an application for DIB on October 23, 2008 (protective filing date), alleging disability as of June 11, 2008, due to "Crohn's disease, [and] post traumatic stress disorder."[1] (Tr. at 17, 139-42, 163, 167.) The claims were

---

[1] Claimant stated that these illnesses limited his ability to work as follows:

The Crohn's disease causes me pain in my abdominal area making my ability to work compromised at best. During period of Crohn's flare up my ability to work is impossible due to pain, diarrhea, and hospitalization. The post traumatic stress disorder, in which I am considered 70% disabled from the V.A. also causes me

denied initially and upon reconsideration. (Tr. at 69-70, 71-73, 79-81.) On October 7, 2009, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 82-83.) The hearing was held on December 21, 2010, before the Honorable Thomas W. Erwin. (Tr. at 33-68.) By decision dated January 20, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 17-32.) The ALJ's decision became the final decision of the Commissioner on August 8, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4.) Claimant filed the present action seeking judicial review of the administrative decision on September 24, 2012, pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2011). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from

---

periods of severe depression, nightmares, flashbacks, hypervigilance, irritability, etc. All of which have caused trouble with finding and holding down gainful employment. Also the remicade treatment I receive for the Crohn's disease causes me to be severely fatigued for up to 2 weeks afterward.

(Tr. at 167.) On his Disability Report - Appeal, dated, October 9, 2009, Claimant reported that as of September 1, 2009, he began experiencing increased pain without relief, increased stress, and lack of motivation as a result of his impairments. (Tr. at 229.)

2

a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2011). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

*(c) Rating the degree of functional limitation.* (1)Assessment of functional

3

limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective

4

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since June 11, 2008, his alleged onset date. (Tr. at 20, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of "Crohn's disease; scar residuals of his left knee; and post traumatic stress disorder (PTSD)." (Tr. at 20, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's

---

disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 21, Finding No. 4 and Tr. at 27, Finding No. 13.) The ALJ then found that from June 11, 2008, through October 25, 2009, Claimant had a residual functional capacity ("RFC") to perform a range of light level work with limitations as follows:

> [H]e could occasionally climb ladders, ropes, or scaffolds; he needed to avoid concentrated exposure to hazards, such as unprotected heights and machinery. The [C]laimant could not perform complex tasks, and was unable to perform in a work environment with any production rate or pace work; he could work in a low stress work environment, with no more than occasional decision making or changes in the work setting. The [C]laimant could have no more than occasional interaction with the public, co-workers, and/or supervisors. Additionally, the [C]laimant would have missed four or more days of work per month, due to exacerbation of symptoms of Crohn's disease and would also have required unpredictable and unscheduled breaks due to flare up of Crohn's disease symptoms.

(Tr. at 22, Finding No. 5.) At step four, the ALJ found that from June 11, 2008, through October 25, 2009, Claimant was incapable of performing his past relevant work. (Tr. at 25, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that from June 11, 2008, through October 25, 2009, there were no jobs that existed in significant numbers in the national economy that Claimant could have performed. (Tr. at 26, Finding No. 10.) On this basis, the ALJ found that Claimant was under a disability from June 11, 2008, through October 25, 2009. (Tr. at 27, Finding No. 11.)

The ALJ found that medical improvement occurred as of October 26, 2009. (Tr. at 27, Finding No. 12.) The ALJ found that beginning on October 26, 2009, Claimant had a RFC to perform light work as follows:

> [T]he [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he can occasionally climb ladders, ropes, or scaffolds; he needs to avoid concentrated exposure to hazards, such as unprotected heights and machinery. The [C]laimant cannot perform complex tasks, and is unable to perform in a work environment with any production rate or pace work; he can work in a low stress work environment, with no more than occasional decision making or changes in the work setting. The [C]laimant can have no more than occasional

interaction with the public, co-workers, and/or supervisors.

(Tr. at 28, Finding No. 14.) At step four, the ALJ found that beginning on October 26, 2009, Claimant was incapable of performing his past relevant work. (Tr. at 31, Finding No. 17.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that beginning on October 26, 2009, Claimant could perform jobs such as a file clerk, mail room clerk, and laundry worker, at the light level of exertion. (Tr. at 31-32, Finding No. 19.) On this basis, benefits were denied and Claimant's disability ended on October 26, 2009. (Tr. at 32, Finding No. 20.)

<u>Claimant's Background</u>.

Claimant was born on April 24, 1975, and was 35 years old at the time of the administrative hearing, December 21, 2010. (Tr. at 26, 39, 139.) Claimant had at least a high school education and was able to communicate in English. (Tr. at 26, 39, 166, 172.) In the past, Claimant worked as a carpenter's helper and a sales clerk. (Tr. at. 63, 168-69, 174-81.)

<u>The Medical Record</u>.

The undersigned has reviewed all the evidence of record, including the medical evidence of record, and will discuss it below as it relates to Claimant's arguments.

***Beckley VAMC Progress Notes***:

On March 9, 2001, Dr. M. Hasan conducted an evaluation at the request of the Department of Veteran's Affairs. (Tr. at 244-46.) Claimant reported depression, anxiety, agitation, having a hard time coping, a labile mood, dysphoria, nightmares, survival guilt, an inability to relate to people, and difficulty sleeping. (Tr. at 245.) Mental status exam revealed that Claimant lacked affect, had feelings of some dysphoria, was of average intelligence, was on guard and suspicious, had mood swings and survival guilt, had feelings of uselessness and worthlessness, and had fair insight, judgment, and recall. (Tr. at 246.) Dr. Hasan diagnosed PTSD, generalized anxiety disorder, and assessed a GAF of 60 to

7

65.[3] (Id.) He recommended a therapeutic trial of mood stabilizing drugs and vocational rehabilitation services. (Id.)

Thereafter, Claimant was seen at the Beckley VA Medical Center ("VAMC") for a mental health evaluation on August 7, 2007, by Melissa S. Lewis, M.S.W., a licensed clinical social worker. (Tr. at 369-73.) He reported having felt stressed out for two months, nightmares that caused him to awake sick to his stomach, anxiety, feelings of being mentally and physically drained, exaggerated startle response, and impatience. (Tr. at 369.) Mental status exam revealed impaired recent memory. (Tr. at 372.) Ms. Lewis diagnosed PTSD, assessed a GAF of 60, and recommended that he return in one month to address problems with coping with stress and anxiety. (Tr. at 373.) Claimant returned for individual therapy on September 7, 2007, at which time he reported that he had been doing "pretty good" and that he was "doing a little better." (Tr. at 368.) His nightmares continued but he had become used to it. (Id.) He was assessed with a GAF of 68. (Id.) Ms. Lewis noted on November 20, 2007, that despite the continued nightmares and nervousness, Claimant reported that he was doing well. (Tr. at 362.) He preferred to cope with the PTSD without medications due to the nature of his employment. (Id.) Ms. Lewis noted that Claimant was cooperative and actively engaged in the therapy session. (Tr. at 363.) She assessed a GAF of 68. (Id.)

Claimant transitioned to a new therapist on January 23, 2008, Mary Farmer, M.S.W., Ph.D.,

---

[3]     The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994). A GAF of 61-70 indicates that the person has "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *Id.*

who reported that Claimant had a difficult time over the Christmas holiday but worked through it on his own without medication. (Tr. at 360.) She also assessed PTSD and a GAF of 68. (Tr. at 362.) On April 14, 2008, Claimant reported anxiety, sleep, and OCD issues, though he indicated that he experienced less frequent nightmares. (Tr. at 259.) He was assessed with PTSD, generalized anxiety disorder, and a GAF of 60. (Tr. at 360.) On May 14, 2008, Claimant reported that everything was going well and that he seemed passionate about helping other veterans address and resolve issues related to being in the military and in a combat situation. (Tr. at 358.) Claimant had a positive outlook on the future and kept busy working and spending time with his family. (Id.) He was able to identify triggers that lead to depressive symptoms and was able to avoid certain identified triggers. (Id.) Mental status examination essentially was normal. He was assessed with PTSD, generalized anxiety disorder, and a GAF of 68. (Id.)

On June 24, 2008, Physician's Assistant Russell L. Martin noted that Claimant had a history of PTSD secondary to barracks suicide bomber while deployed in Saudia Arabia. (Tr. at 308.) It was noted that he had a worsening of anxiety, nervousness, and a depressed mood. (Id.) He had fair insight and judgment was assessed with PTSD and anxiety. (Id.) It was recommended that he consider Celexa 10mg and group therapy. (Id.) On July 16, 2008, Debra R. Dees, Physician's Assistant, noted Claimant's continued reports of flashbacks and intrusive thoughts of his past experiences. (Tr. at 290.) Claimant reported that he remained hypervigilant and had an exaggerated startle response. (Id.) She diagnosed PTSD related to personality disorder/traits and assessed a GAF of 50. (Tr. at 292.) Claimant returned to Ms. Dees on August 15, 2008, for individual therapy, at which time he was diagnosed with PTSD, anxiety disorder NOS, and assessed a GAF of 70. (Tr. at 273-74.) On September 8, 2008, he was diagnosed with chronic PTSD and assessed a GAF of 65. (Tr. at 268.) On October 20, 2008, Claimant was assessed with PTSD, generalized anxiety disorder, and a GAF of 70. (Tr. at 259.)

From December 2, 2008, through April 17, 2009, Claimant continued to report that he was doing well, had less anxiety, and had only occasional nightmares and occasional hypervigilance. (Tr. at 757, 772, 780.) On August 5, 2009, however, Lorri J. Hudson, a licensed social worker, noted Claimant's reports of anger, frustration, and irritability, and his tendency to isolate himself when he was likely to blow up. (Tr. at 746.) On mental status exam, Ms. Hudson noted that Claimant was depressed and agitated. (Tr. at 747.) She diagnosed chronic PTSD and assessed a GAF of 45. (Tr. at 748.) One month later, P.A. Debra R. Dees noted Claimant's request to change his medication because he had harsh thoughts about other people. (Tr. at 742.) Claimant had tapered himself off the medication and the problems with the thoughts went away, but the short fuse and anger issues returned. (Id.) Ms. Dees noted that Claimant was stable, assessed a GAF of 60, and changed his medication. (Tr. at 743.) On October 2, 2009, Claimant reported depression and flashbacks, which he knew was a result of going off his medications and starting new medications. (Tr. at 735.) Ms. Dees noted on October 15, 2009, that Claimant was doing better and he stated that his medications were working well. (Tr. at 730.) He denied nightmares and reported that he had fair energy and motivation. (Id.) She again assessed that he was stable on medications and assigned a GAF of 60. (Tr. at 732.)

On December 17, 2009, Ms. Hudson reported that Claimant began his first 90-minute session of prolonged exposure. (Tr. at 717-18.) Ms. Hudson noted that overall, Claimant had excellent insight into his diagnosis of PTSD, attended individual and group psychotherapy in an effort to alleviate the symptoms of his PTSD, was compliant with his medication management, and that he continued to have moderate to severe occupational and social functioning problems. (Tr. at 718.) Mental status exam revealed a depressed mood and agitated affect and logical and relevant thought patterns. (Id.) She diagnosed chronic PTSD and assessed a GAF of 45. (Id.) On January 15, 2010, Claimant reported sleep difficulties; outbursts of anger, frustration, and irritability; bouts of depression; and occasional

10

thoughts of suicide and homicide without intent or plan. (Tr. at 713-14.) Ms. Hudson noted on mental status exam that Claimant was alert and oriented, that his mood was depressed and his affect was agitated, and that he denied any suicidal or homicidal ideation. (Tr. at 714.) She diagnosed chronic PTSD and assessed a GAF of 45. (Id.)

On January 21, 2010, Ms. Hudson noted that Claimant had completed two sessions of prolonged exposure and he preferred to continue individual therapy with cognitive processing to prolonged exposure. (Tr. at 709-10.) He felt that the therapy was a little too intense for him and was not in need of reviewing the trauma he experienced in that way. (Tr. at 709.) Ms. Hudson diagnosed chronic PTSD and assessed a GAF of 45. (Tr. at 710.) Also on that same day, physician's assistant, Ms. Dees saw Claimant and reported that Claimant related that his medications were working well and that he was "doing okay." (Tr. at 710-11.) He reported that his energy and motivation were fair, that he had learned to cope from the therapy and was at a "happy medium," and that he stayed busy to keep his symptoms under better control. (Tr. at 711.) Ms. Dees noted on mental status exam that Claimant's mood was euthymic with a congruent affect, that his thoughts and responses were appropriate with good eye contact, that he had good judgment and insight, and that his memory was intact. (Tr. at 712.) She diagnosed him as stable with a GAF of 60. (Id.)

On May 28, 2010, Ms. Dees again noted Claimant's reports that his medications were working well and that his energy and motivation were better. (Tr. at 692.) She noted that he was experiencing flashbacks and intrusive thoughts and was emotionally detached and withdrawn. (Id.) She diagnosed him as stable and assessed a GAF of 60. (Id.) On August 30, 2010, Claimant reported that he had been "doing pretty good," and that his medication worked well with no ill effects. (Tr. at 680.) Ms. Dees noted that he continued to experience symptoms of PTSD and preferred solitude and isolation and disliked crowds. (Tr. at 681.) She diagnosed him as stable with medications and assessed a GAF of

50. (Tr. at 682.)

On January 3, 2011, Ms. Dees completed a form Mental Assessment of Ability to Do Work-Related Activities (Mental), on which she opined that Claimant's ability to make occupational adjustments was markedly and extremely limited. (Tr. at 976-79.) She indicated these limitations were due to his PTSD, generalized anxiety disorder, irritability, and being easily angered, agitated, and anxious at times. (Tr. at 977.) She indicated that Claimant's ability to make performance adjustments was moderately and markedly limited because his medications can cause cognitive impairments and his anxiety and PTSD can interfere with his ability to concentrate and focus. (Tr. at 977-78.) Ms. Dees also opined that Claimant's ability to make personal and social adjustments was markedly and extremely limited because of problems with lack of motivation and reliability due to his lack energy. (Tr. at 978.)

### *Department of Veterans Affairs Rating Decision*:

On November 19, 2009, a Department of Veterans Affairs Ratings Decision indicated that Claimant was entitled to individual unemployability effective July 15, 2008. (Tr. at 951.) By Rating Decision dated December 15, 2009, the Department of Veterans Affairs indicated that Claimant should have been entitled to individual unemployability as of May 30, 2008. (Tr. at 950.) On January 12, 2010, the Department of Veterans Affairs indicated that Claimant was granted a 100% entitlement rate effective May 30, 2008, because he was unable to work due to his service connected disabilities. (Tr. at 955-56.)

### *Beckley Appalachian Regional Hospital*:

Claimant was admitted to Beckley ARH on July 9, 2008, for confusional episode and possible steroid-induced psychosis. (Tr. at 455-56.) Claimant had been treated with a high dose of steroids and his first dose of Remicade for the treatment of Crohn's disease. (Tr. at 455.) Dr. Charles F. Bou-

12

Abboud, M.D., found that Claimant's mental status was stable. (Tr. at 456-57.) He was discharged on July 12, 2008, with the diagnoses of PTSD and acute paranoid psychosis, *inter alia*. (Tr. at 448.) He was prescribed Ativan .5mg as needed. (Tr. at 449.)

Claimant again was admitted to the hospital on July 12, 2008, and seen on consultation by Dr. Ahmed Faheem, M.D. (Tr. at 425-26.) Dr. Faheem noted that when admitted, Claimant appeared very actively psychotic, was easily agitated, and became unmanageable. (Tr. at 425.) During the course of his hospital stay, he was given intramuscular Geodon and placed on Zyprexa and Ativan. (Id.) His psychosis was in remission on July 16, 2008, and he was discharged with the final diagnoses of paranoid psychosis NOS and history of PTSD. (Id.) On July 18, 2008, Claimant was taken to the hospital after having experienced increased confusion at his home, which was attributed to steroids and a bad reaction to Remicade. (Tr. at 413.) Claimant was discharged the same day. (Id.)

### *Tina Fontenot, M.S. - Consultative Evaluation*:

Ms. Fontenot conducted a consultative evaluation on May 11, 2009, at the request of the state agency. (Tr. at 498-501.) Claimant reported depression since 1996, two panic attacks every six months, daily anxiousness, sleep disturbance, daily low energy and fatigue, paranoia, and occasional fleeting thoughts of suicide but no intent to act. (Tr. at 499.) Mental status exam essentially was normal with the exception of moderately deficient recent memory. (Tr. at 500.) Ms. Fontenot opined that Claimant's social functioning, concentration, persistence, and pace were within normal limits. (Id.) She noted his daily activities to have included arising at 6:00 a.m., showering, eating breakfast, working on their home, baby-sitting his son, sharing household chores with his wife, paying the bills, grocery shopping with his wife, and caring for his personal grooming. (Tr. at 501.) Ms. Fontenot diagnosed PTSD and noted that the diagnosis was based on Claimant having received 70% disability for this disorder, and that his prognosis was fair. (Id.) She also opined that Claimant was capable of managing

13

his finances. (Id.)

### John Todd, Ph.D. - Psychiatric Review Technique ("PRTF"):

On June 8, 2008, Dr. Todd, completed a form PRT on which he opined that Claimant's PTSD was a non-severe impairment, that resulted in only mild limitations in maintaining activities of daily living, social functioning, concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. at 502-15.)

### Paula J. Bickham, Ph.D. - Mental RFC & PRTF:

On August 29, 2009, Dr. Bickham completed a form Mental RFC assessment on which she opined that Claimant was limited moderately in his ability to work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 601-03.) She opined that Claimant was not significantly limited in all remaining functional categories. (Id.) Dr. Bickham further opined that Claimant "retain[s] the ability to learn and perform work-like activities in a setting that has minimal contact with coworkers or the general public." (Tr. at 603.) On the PRTF, Dr. Bickham opined that Claimant's PTSD resulted in mild limitations in maintaining activities of daily living, concentration, persistence, or pace; moderate limitations in maintaining social functioning; and no episodes of decompensation of extended duration. (Tr. at 615.)

### Dr. Cherrie Hunter, Psy.D. - Mental Assessment of Ability to Do Work-Related Activities - Mental:

On January 11, 2010, Dr. Hunter opined that Claimant was moderately to extremely limited in his ability to make occupational adjustments because he exhibited paranoia around others and was very distrusting. (Document No. 7, Exhibit 1 at 2.) She noted that he did not take directions well from

14

others, had difficulty focusing and concentrating, and often left tasks unfinished. (Id.) Dr. Hunter opined that Claimant had moderate and marked limitations in his ability to make performance adjustments because he had problems remembering and carrying out instructions, was easily distracted, lost focus, and had short-term memory deficits. (Id. at 3.) She indicated that Claimant had moderate to extreme limitations in his ability to make personal social adjustments because he was prone to irritability, anger outbursts, and had a low tolerance for frustration. (Id.) She indicated that he could become verbally assaultive and in the past he had thrown and broken objects. (Id.) Dr. Hunter noted that Claimant's primary difficulties are PTSD-related. (Id.) She indicated that he was hypervigilant and startled very easily as a means of self-protection. (Id.)

Claimant's Challenges to the Commissioner's Decision.

Claimant first alleges that the ALJ's decision is not supported by substantial evidence because the ALJ erred in applying properly the medical improvement standard and finding that Claimant's disability ended on October 26, 2009. (Document No. 7 at 2-6.) Claimant contends that the record fails to support any significant improvement in his post-traumatic stress disorder since October 26, 2009, as the ALJ found. (Id. at 4.) He asserts that contrary to the ALJ's RFC assessment, Dr. Hunter opined that Claimant has extreme and marked functional limitations. (Id. at 5.) Claimant further asserts that Dr. Hunter's opinion is supported by the opinion of Physician's Assistant Debra Dees. (Id. at 6.) Claimant also asserts that the ALJ erred in according limited weight to the opinion of Ms. Dees because she was a physician's assistant. (Id. at 6-8.) He asserts that the Regulations provide that evidence from other sources, such as physician's assistants shall be used to show the severity of a claimant's impairment and how it affects the claimant's ability to work. (Id. at 7.) Claimant contends that Ms. Dees was an active participant in the treatment of his PTSD and met with him consistently every two or three months for medical management of his mental health symptoms. (Id. at 8.) He

asserts therefore, that Ms. Dees' opinions are consistent with the treatment records from the VA. (Id.)Claimant also asserts that the ALJ's decision is not supported by substantial evidence because the ALJ erred in failing to discuss the consideration given to the Department of Veterans Affairs determination that Claimant was 100% disabled. (Document No. 7 at 8-9.) He asserts that pursuant to SSR 06-03p, "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered." (Id. at 9.)

In response, the Commissioner asserts that Claimant's argument is without merit and that the ALJ properly found that Claimant's PTSD improved on October 26, 2009. (Document No. 10 at 12-15.) The Commissioner asserts that just prior to October 26, 2009, Ms. Dees assessed Claimant with a GAF of 60, which did not preclude occupational activity. (Id. at 12.) Ms. Dees noted that Claimant was doing better, that his medications were working well, and that his mental status exam was normal. (Id. at 12-13.) The Commissioner notes that in January 2010, and May 2010, Claimant again was assessed with a GAF of 60 and he was diagnosed as stable. (Id. at 13.) The Commissioner points out that in November 2009, one month after the ALJ found that his condition had improved, Dr. Hunter diagnosed Claimant's PTSD as stable. (Id.) Respecting Ms. Dees' opinion, the Commissioner first asserts that her findings are inconsistent with progress notes that indicated essentially normal mental status examinations. (Document No. 10 at 13-14.) Second, the Commissioner asserts that Ms. Dees' opinion is unsupported by the other evidence of record and her consistent findings that he was doing better. (Id. at 14.) Third, the Commissioner asserts that Ms. Dees' opinion is inconsistent with prior GAF assessments of 65 and 70. (Id.) Nevertheless, the Commissioner asserts that the ALJ limited Claimant to a low stress work environment and precluded work that involved complex tasks, production rate or pace, more than occasional decision making or changes in the work setting, and more than occasional interaction with the public, co-workers, and supervisors. (Id. at 14-15.)

Finally, the Commissioner asserts that Claimant's reliance on Dr. Hunter's opinion is without merit as her findings are inconsistent with her own prior findings and the other substantial evidence of record. (Id. at 15.) The Commissioner asserts that this new evidence would not have changed the ALJ's decision and therefore, is not a basis for remand. In reply, Claimant asserts that Dr. Hunter's opinion was submitted to the ALJ prior to his decision and to the Appeals Council but was not made a part of the administrative record. (Document No. 11 at 3.) He asserts that the opinion has not been properly considered and cannot be summarily discarded by the Commissioner's opinion that it would not change the ALJ's decision. (Id.) Claimant asserts that Dr. Hunter's opinion directly contradicts the ALJ's RFC assessment and is relevant to Claimant's functioning prior to the issuance of the ALJ's decision. (Id.)

In response, the Commissioner asserts that contrary to Claimant's argument, the ALJ specifically noted the VA's rating decision (Tr. at 30.), and that Claimant was unemployable effective July 15, 2008. (Document No. 10 at 15-16.) The Commissioner asserts that the ALJ properly noted that the Social Security Administration applies a different set of standards to determine disability and that the VA's determination of unemployability is not the same as a finding of disability based on Social Security Administration standards. (Id. at 15.) The Commissioner therefore, contends that the ALJ appropriately considered the VA decision and that his decision is supported by the substantial evidence of record. (Id. at 16.)

In reply, Claimant asserts that the ALJ improperly applied the medical improvement standard. (Document No. 11 at 1-2.) He asserts that with respect to his PTSD, the ALJ had to determine that the impairment had decreased in medical severity by October 26, 2009, and that any improvement in the condition was related to his ability to work. (Id.) Claimant asserts that the ALJ did not discuss his PTSD rating beyond stating that he "worked on a full-time basis while he received

treatment for PTSD." (Document No. 11 at 4.) Claimant asserts that this is contrary to the high level of consideration required by the Regulations. (Id.) He contends that the ALJ was required "to explain the consideration given to the Veterans Affairs Rating decision, especially as it relates to [Claimant's] post-traumatic stress disorder and resulting limitations to perform work-related activities." (Id.)

Analysis.

1. Medical Improvement Standard.

Claimant first alleges that the ALJ erred in applying the medical improvement standard pursuant to 20 C.F.R. § 404.1594(b)(1), and finding that his PTSD medically improved on October 26, 2009. (Document No. 7 at 2-8.) Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1) (2011). A decrease in medical severity may be based on changes or improvements in the "symptoms, signs, and/or laboratory findings associated with your impairment(s)." (Id.) To determine medical improvement, the ALJ must "compare the current medical severity of that impairment(s) which was present at the time of the most recent favorable decision that you were disabled or continued to be disabled to the medical severity of that impairment(s) at that time." 20 C.F.R. § 404.1594(b)(7). If medical improvement has occurred, then the ALJ will determine "how and to what extent your impairment(s) has affected your ability to work." 20 C.F.R. § 404.1594(b)(4). Thus, the ALJ determines whether there has been an increase in your RFC based on impairments that existed at the most recent favorable medical decision. Id. See also, Grim v. Colvin, 2013 WL 6589562, * 2 (S.D. W.Va. Dec. 16, 2013)(M.J. Eifert).

From June 11, 2008, through October 25, 2009, the ALJ found that Claimant was disabled based in part on his Crohn's disease and PTSD. (Tr. at 22-27.) Respecting his PTSD the ALJ noted

Claimant's diagnoses of mild to moderate PTSD and generalized anxiety disorder. (Tr. at 23-25.) He acknowledged Claimant's participation in group psychotherapy sessions to learn to cope with PTSD and his reports that he had done well and was better able to cope. (Tr. at 24.) By October 15, 2009, Claimant was doing much better controlling his anger and reported restful sleep without nightmares on medication, but continued to report flashbacks and emotional detachment. (Id.) The ALJ noted that Claimant was assessed with a GAF ranging from 45 to 70 through October 25, 2009. (Tr. at 23-25.) Ms. Bickham assessed only mild and moderate limitations in Claimant's ability to work. (Tr. at 25.) The ALJ concluded that Claimant was unable to perform complex tasks or work in an environment with any production rate or pace work. (Tr. at 22.) He limited Claimant to a low stress work environment with no more than occasional decision making or changes in the work setting or interaction with the public, co-workers, or supervisors. (Id.)

Claimant's disability ended on October 26, 2009, the date the ALJ found medical improvement occurred. (Tr. at 27.) The ALJ noted that by January 21, 2010, Claimant's GAF had improved to 60 and he reported that he was "doing okay," denied nightmares, and had learned coping skills through therapy. (Id.) Though he continued to experience symptoms of PTSD, Claimant had acquired the skills to work through it. (Id.) The ALJ noted on May 28, 2010, that Claimant reported increased energy and motivation, denied nightmares, and reported that his family had returned from vacation. (Id.) Finally, on August 30, 2010, the ALJ noted that Claimant again reported that he was doing pretty good, had experienced some increased nervousness but was able to collect himself, and that he preferred solitude. (Id.) The ALJ noted Ms. Dees' January 3, 2011, mental assessment that consisted of marked limitations, but gave the opinion limited weight as it was unsupported by the evidence of record and was not by an acceptable medical source. (Tr. at 30-31) The ALJ therefore, assessed that Claimant was capable of working but could not perform complex tasks or work with any production rate or pace and

19

must work in a low stress work environment with only occasional decision making or changes in the work setting. (Tr. at 28.) Furthermore, he can have only occasional interaction with the public, co-workers, and supervisors. (Id.)

In view of the foregoing, the undersigned finds that the ALJ's finding of medical improvement is not supported by the substantial evidence of record. The evidence of record respecting Claimant's PTSD has remained fairly constant and the ALJ failed to identify the improvement, particularly as it relates to Claimant's RFC. The ALJ notes that Claimant's GAF had improved to 60. The evidence prior to October 26, 2009, demonstrates that Claimant was consistently assessed with a GAF of 65 and 70. (Tr. at 259, 268, 273-74, 732, 743.) He also received the occasional GAF of 45, particularly when seen by Ms. Hudson, which as the ALJ noted, seemed to be related to an event in Claimant's life. The ALJ notes in his decision that Claimant had learned coping skills and was now able to talk himself down. (Tr. at 27.) The evidence reveals that on January 23, 2008, Claimant was able to work his way through a difficult time over the holidays on his own and without medication. (Tr. at 360.) He reported on May 14, 2008, that everything was going well, had a positive outlook, kept busy, and enjoyed spending time with his family. (Tr. at 358.) He indicated from December 2, 2008, through April 17, 2009, that he had less anxiety, had only occasional nightmares, and was doing well with his medications. (Tr. at 735, 757, 772, 780.) The medical evidence suggests a continuance of Claimant's condition, especially in the absence of a medical opinion from any acceptable examining, treating, or reviewing medical source. The ALJ's finding of medical improvement based solely on the progress notes, which reflect a continuance or only a slight improvement is dubious, at best, in the absence of such a medical opinion. Accordingly, in view of the foregoing, the undersigned finds that the ALJ's opinion fails to set forth the specific bases for the medical improvement of Claimant's PTSD, and therefore, remand is required.

2. <u>Physician's Assistant Opinion</u>.

Claimant also alleges that the ALJ erred in giving limited weight to the opinion of P.A. Debra Dees. (Document No. 7 at 6-8.) The Regulations require that ALJs consider all evidence from "acceptable medical sources" including licensed physicians and other providers. 20 C.F.R § 404.1513(a). Physicians' assistants are not "accepted medical sources" but qualify as "other sources" under 20 C.F.R. § 404.1513(d)("In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include . . . physicians' assistants. . ..") The rules for evaluating acceptable medical source statements and opinions do not apply, therefore, to statements and opinions of physicians' assistants. ALJs may consider any opinions of physicians' assistants as additional evidence, but they are not required to assign them weight, controlling or otherwise, in their evaluations of evidence. <u>Craig v. Chater</u>, 76 F.3d 585, 590 (4th Cir. 1996); <u>Yost v. Barnhart</u>, 79 Fed.Appx. 553, 555 (4th Cir. 2003)(affirming District Judge Chambers' denial of benefits and finding no error in the ALJ's rejection of the opinion of a physical therapist respecting the claimant's physical impairments.).

The ALJ summarized Ms. Dees' opinion and indicated her assessed extreme and marked limitations. (Tr. at 30-31.) The undersigned finds the ALJ's summary of Ms. Dees' functional capacity evaluation accurate and his treatment of her evaluation as evidence in conformity with the applicable law and Regulations. The ALJ assigned her opinion limited weight as she was only a physician's assistant under the Regulations. Furthermore, the progress notes from Ms. Dees consistently demonstrate Claimant's reports that he was doing well, that his medications were working well, that he had essentially normal mental status exams, and that she assessed a GAF

ranging anywhere from 60 to 70. Her extreme and marked limitations contradict her progress notes as the ALJ found. Accordingly, the undersigned finds the ALJ's conclusion reasonable.

3. Additional Evidence.

Claimant further alleges that he submitted Ms. Hunter's opinion to the ALJ prior to the issuance of his decision and to the Appeals Council but the opinion was not made a part of the record. (Document No. 7 at 4-6.) To the extent that Claimant is alleging remand on the basis of new evidence, the undersigned finds that remand is warranted. The Court notes initially that the social security regulations allow two types of remand. Under the fourth sentence of 42 U.S.C. § 405(g), the court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence. 42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 97-98, 111 S.Ct. 2157, 2163, 115 L.Ed.2d 78 (1991). Where there is new medical evidence, the court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence. 42 U.S.C. § 405(g); Melkonyan, 501 U.S. at 98, 111 S.Ct. at 2163. The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute. Melkonyan, 501 U.S. at 98, 111 S.Ct. at 2163.

To justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985).[4]  In

[4] Within relevant case law, there is some disagreement as to whether 42 U.S.C. § 405(g) or the opinion in *Borders* provides the proper test in this circuit for remand of cases involving new evidence. This court will apply the standard set forth in Borders in accordance with the reasoning previously expressed in this district:

The court in *Wilkins v. Secretary of Dep't of Health & Human Servs.*, 925 F.2d 769 (4th Cir. 1991), suggested that the more stringent  Borders four-part inquiry is superseded by the standard in 42 U.S.C. 405(g).  The standard in § 405(g) allows for remand where "there is new evidence which is material and . . . there is good cause for the failure to

Borders, the Fourth Circuit held that newly discovered evidence may warrant a remand to the Commissioner if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence.  Id.

With regard to the new evidence submitted, the Claimant has satisfied all four factors of Borders, and therefore, remand on the basis of new evidence is appropriate. Claimant submitted to the ALJ and to the Appeals Council a mental RFC assessment by his treating psychologist, Dr. Hunter, dated January 11, 2010. (Document No. 7, Exhibit 1.)

Under the Borders analysis, the undersigned first finds that the evidence is relevant to the determination at the time the application was filed, as the opinion was dated January 11, 2010, and fell within the relevant time period June 11, 2008, through January 20, 2011. Under the second step of the Borders analysis, the undersigned finds that the evidence is material. Although the opinion appears somewhat internally inconsistent with Dr. Hunter's limited treatment of Claimant (e.g., Tr. at 697, 719, 757.), which does not reflect any extreme limitations or negative mental status findings, Dr. Hunter's opinion is the only opinion of record by one of Claimant's treating psychologists.

Claimant appears to meet the third step in the Borders analysis. The undersigned finds that

---

incorporate such evidence into the record in a prior proceeding." However, Borders has not been expressly overruled.  Further, the Supreme Court of the United States has not suggested that *Borders*' construction of § 405(g) is incorrect.  Given the uncertainty as to the contours of the applicable test, the Court will apply the more stringent *Borders* inquiry.

*Brock v. Secretary, Health and Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D. W.Va. 1992) (citations omitted).

Claimant submitted Dr. Hunter's opinion on January 18, 2011, prior to the issuance of the ALJ's decision, and then again with his brief to the Appeals Council on April 15, 2011. For some reason, the opinion was not made a part of the administrative record and there is no indication that it was considered by the Appeals Council as the Order failed to indicate additional evidence received.

Finally, Borders requires that the Claimant present at least a general showing of the new evidence to the Court.  Claimant submitted Dr. Hunter's opinion to the ALJ, to the Appeals Council, and the exhibit was attached to Claimant's Brief, which is available for the Court's review.

4. VA Decision.

Finally, Claimant asserts that the ALJ erred in failing to discuss the consideration given to the Department of Veterans Affairs determination that he is 100 percent disabled. (Document No. 7 at 8-9.)  The ultimate determination of disability in the instant matter is an issue reserved to the Commissioner, who is not bound by the findings of other agencies with respect to disability. See 20 C.F.R. § 404.1504 (2011). Social Security Ruling SSR 06-03 instructs the Commissioner to evaluate such ratings as opinion evidence, which the ALJ in the instant case did. Despite the VA's 100 percent rating, the ALJ stated that Claimant

> was able to work on a full-time basis while he received treatment for PTSD; the additional symptoms of Crohn's disease rendered the [C]laimant unable to work from June 11, 2008, through October 25, 2009; however, on October 26, 2009, with no further evidence to support the existence of any Crohn's symptomatology, the [C]laimant was medically improved and able to work as described in the above-defined residual functional capacity.

(Tr. at 30.)

The foregoing statement sounds like the ALJ found Claimant disabled solely on the basis on his Crohn's disease and not on the basis of his PTSD. Accordingly, on remand, the undersigned recommends that the ALJ make the record clear whether there were any significant limitations

resulting from Claimant's PTSD and what, if any, weight he gave the VA rating regarding the PTSD decision.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 7.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 10.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter for further proceedings consistent with this Proposed Findings and Recommendation pursuant to the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall

be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 26, 2014.

R. Clarke VanDervort
United States Magistrate Judge